# 11 CIV 5750

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| ROBERT CHEATHAM, on Behalf of Himself and all Others Similarly Situated, | ) ) ) | Civil Action No. |
| Plaintiff, | ) ) ) | **CLASS ACTION COMPLAINT** |
| vs. | ) ) ) | **JURY TRIAL DEMANDED** |
| HACHETTE BOOK GROUP, INC.; HARPERCOLLINS PUBLISHERS, INC.; MACMILLAN PUBLISHERS, INC; PENGUIN GROUP (USA) INC.; SIMON & SCHUSTER, INC.; and APPLE INC., | ) ) ) ) ) | |
| Defendants. | ) ) | |

Plaintiff Robert Cheatham ("Plaintiff"), by and through his undersigned counsel, based on the investigation of counsel, upon personal knowledge as to himself, and upon information and belief as to all other matters, alleges as follows:

## INTRODUCTION

1.     In 2007, Amazon released the Kindle, and in 2009, Barnes & Noble released the Nook. Both of these products are handheld digital reading devices for electronic books or "eBooks." Using an "electronic ink" screen, these devices replicated the appearance of ink on paper and introduced numerous convenient characteristics and advantages to reading books that are unique to a digital format.

2.     eBook technology reduces distribution costs associated with traditional print publishing. Thus, as publishers quickly realized, eBooks led to lower consumer prices, improved consumer welfare, and threatened their current business model and profit margins. Given this

threat to their business model, several major book publishers, working with Apple Inc. ("Apple"), successfully quelled free market competition by coordinating their activities to restrain trade in eBooks.

3.      Amazon provides an apt example of the perceived threat by the major book publishers.  Amazon set eBook pricing levels significantly below prices for physical books— paper books or hardcover books.  For instance, Amazon set the prices of many of the popular newly released eBooks at $9.99.  Amazon instituted this pro-consumer, discounted pricing even though, for many titles, publishers charged Amazon a wholesale price at or above $9.99.

4.      Although publishers were reaping the benefits of eBooks via an expanded consumer base and increased volume of units sold (via eBook sales), publishers also feared Amazon's $9.99 pricing would erode revenues overall.  The discount pricing threatened the publishers' traditional print and sales model, and in particular the sale of higher-priced physical copies of books.  The publishers also anticipated that Amazon would use its market power to reduce the publishers' share of the available profit margins from each eBook sale.

5.      The publishers named as defendants ("Publisher Defendants") knew that no single publisher could slow down Amazon and unilaterally force an increase in eBook retail prices.  If one publisher acted alone to raise prices, that publisher would risk immediately losing a substantial (and growing) volume of eBook sales.  Not wanting to risk this significant loss, Publisher Defendants acting in concert forced a complete restructuring of the eBook sales model.  Specifically, they coordinated between themselves and Apple to force Amazon to abandon its discount pricing.

6.      The purpose and effect of this restructuring was to halt the discounting of eBook prices and uniformly raise prices on all first release fiction and nonfiction books published by the

Publisher Defendants. Under the Publisher Defendants' new pricing model, known as the "Agency Model," the Publisher Defendants restrained trade by fixing their pricing to directly set retail prices higher than had existed in the previously free competitive market.

7.      The Publisher Defendants' unlawful combination and pricing agreement would not have succeeded without the active participation of Apple, who facilitated changing the eBook pricing model and actively and intentionally conspired with the Publisher Defendants to do so.

8.      Apple's motive in helping the Publisher Defendants to restrain trade and increase the price of eBooks was clear: If Amazon continued to solidify its dominant position in the sale of eBooks, strong network effects would make it difficult to dislodge Amazon. Moreover, Amazon's discount pricing meant that to enter the eBooks market, Apple would likely be forced to sell at least some eBooks near or below its wholesale costs for an extended period of time. Apple did not want to enter the eBooks market subject to this margin pressure caused by Amazon's pricing. However, Apple desperately wanted to enter the eBook market because the Kindle was and continues to be a competitive threat to Apple's own business model.

9.      Apple is competing to be a dominant manufacturer of mobile devices, such as Apple's iPod, iPhone and iPad devices. These devices are designed to distribute, store, and access digital media through Apple's iOS platform, including Apple's App Store and iTunes Store. Apple knew that if Amazon could establish the Kindle as the dominant eBook reader by subsidizing the purchase of eBooks, Amazon could then use the Kindle platform (and its large user base) to distribute other digital media in direct competition with Apple. Apple knew how successful this strategy could be as it had successfully used a nearly identical strategy to gain a virtual monopoly on the distribution of digital music files through its iPod device and associated iTunes store.

10.     Publisher Defendants and Apple implemented this unlawful agreement and combination on or before January 2010, when the "Publisher Defendants" (five of the six major book publishers of fiction and nonfiction works) almost simultaneously announced that they were switching from a wholesale pricing model to an Agency Model for eBook sales.  This was an unprecedented industry shift in pricing (and sales model) in the book industry in the United States.  The announcements to shift to the Agency Model coincided with Apple's release of the iPad tablet.  In fact, when Apple announced the launch of the iPad on January 27, 2010, the Publisher Defendants agreed to allow Apple to use their trademarks in connection with the iPad.

11.     The same day Apple announced its launching of the iPad, it also announced that Apple had struck deals with Hachette, HarperCollins, Macmillian, Penguin, and Simon & Schuster to switch to the Agency Model for Apple's iBookstore.  iBookstore is the application on Apple's iPad that functions as an eBook reader.

12.     As part of their unlawful agreement, and seeking to leverage Apple's installed user base and dominant position via the Apple iOS platform, Apple and the Publisher Defendants agreed that prices for Publisher Defendants' eBooks that were offered through the iBookstore would be calculated by a formula tied to the prices of physical books.  This eBook formula would cause current prices for eBooks to increase and, at the same time, would guarantee Apple that the Publisher Defendants would not sell eBooks at lower prices elsewhere, such as through other eBook distributors, including Amazon.  The intended effect of this agreement was to force Amazon to abandon its discount pricing of eBooks and allow the Publisher Defendants to establish uniformly higher prices for new release eBooks.

13.    The conspiracy and agreements worked as intended: (1) the Defendants increased

and controlled eBook pricing; and (2) Amazon was forced to stop discounting eBook prices on

Publisher Defendants' titles.

14.    As a direct result of this anticompetitive conduct as intended by the conspiracy,

the price of eBooks has soared.  The price of new bestselling eBooks increased to an average of

$12-$15 – an increase of 33 to 50 percent.  The price of an eBook in many cases now approaches

– or even exceeds – the price of the same book in paper even though there are almost no costs to

produce each additional eBook unit.  The price of the Publisher Defendants' eBooks sold

through the iBookstore, facing minimal, if any, pricing competition from Amazon or other e-

distributors for the exact same eBook titles, has remained at supra-competitive levels.

15.    Plaintiff brings claims on behalf of himself and the members of the Class (as

herein defined) under federal antitrust laws and under the common law of unjust enrichment to

enjoin the illegal conduct described herein and to obtain damages.

## PARTIES

16.    Plaintiff Robert Cheatham is a resident of the City and State of New York.

Plaintiff purchased at least one eBook at a price above $9.99 from a Publisher Defendant and/or

Apple for use on his iPad 2.

17.    Plaintiff paid higher prices for his eBooks as a direct and foreseeable result of the

unlawful conduct set forth below.

18.    Defendant Apple is a California corporation having its principal place of business

at 1 Infinite Loop, Cupertino, CA 95014.  Apple is a leading manufacturer of mobile devices

designed to distribute, store, and display digital media.  Examples of such devices include the

Apple iPad device, a tablet computer which supports several electronic reader or "eReader" applications, including the Kindle App, and Apple's proprietary app, iBookstore.

19.     Defendant Hachette Book Group, Inc. ("Hachette") is a leading U.S. trade publisher with its principal place of business at 237 Park Ave., New York, NY 10017. Its imprints include Little, Brown & Co. and Grand Central Publishing. On information and belief, Hachette is owned by Hachette Livre, a French company.

20.     Defendant HarperCollins Publishers, Inc. ("HarperCollins") is a leading U.S. trade publisher with its principal place of business at 10 East 53rd St., New York, NY 10022. Its imprints include Ecco, Harper, Harper Perennial and William Morrow. On information and belief, HarperCollins is a subsidiary of News Corporation.

21.     Defendant Macmillan Publishers, Inc. ("Macmillan") is a group of leading publishing companies with its principal place of business at 175 Fifth Ave., New York, NY 10010. Its U.S. publishers include Farrar Straus and Giroux, Henry Holt & Company, Picador, and St. Martin's Press. On information and belief, Macmillan is held by Verlagsgruppe Georg von Holtzbrinck, which is based in Stuttgart, Germany.

22.     Defendant Penguin Group (USA) Inc. ("Penguin") is the U.S. affiliate of Penguin Group, one of the largest English-language trade book publishers in the world. Penguin's principal place of business is at 375 Hudson St., New York, NY 10014. Its imprints include Viking, Riverhead Books, Dutton and Penguin Books.

23.     Defendant Simon & Schuster, Inc. ("Simon & Schuster") is a leading U.S. trade publisher with its principal place of business at 1230 Avenue of the Americas, New York, NY 10019. Its imprints include Simon & Schuster, Scribner, Atria and Gallery Books. On information and belief, Simon & Schuster is part of CBS Corporation.

24.     The Publisher Defendants comprise five of the country's six largest publishers.

## JURISDICTION AND VENUE

25.     This Court has subject matter jurisdiction over this action pursuant to 15 U.S.C.

§§ 4 and 15; and 28 U.S.C. §§ 1331 and 1337, in that this action arises under the federal antitrust

laws.

26.     This Court also has diversity jurisdiction over this action under the Class Action

Fairness Act, 28 U.S.C. § 1332(d)(2) ("CAFA"). There are members of the Class who are

citizens of a different state than Defendants. The matter in controversy exceeds the sum or value

of $5,000,000, exclusive of interest and costs, and this is a class action in which the number of

members of the proposed Class is not less than 100.

27.     Venue is proper in this District under 28 U.S.C. § 1391(b) and (c) and Sections 4

and 12 of the Clayton Act, 15 U.S.C. §§ 15 and 22, because Defendants reside, transact business,

or are found within this District, and a substantial part of the events giving rise to the claims

arose in this District.

## FACTUAL ALLEGATIONS

**Market Power Over eBook Sales**

28.     An eBook is the electronic equivalent of a conventional print book usable in

various digital media and sometimes restricted with a digital rights management (DRM) system.

eBooks represent a distinct antitrust market. The geographic market is the entire United States.

No reasonable substitute exists for eBooks.

29.     Consumers who purchase eBooks value their digital format characteristics, such

as flexibility and portability. Consumers of eBooks can instantly purchase and carry thousands

of books on a single device. In addition, eBook readers need not pay shipping costs associated

with online purchases of physical books. Moreover, eBooks have a highly unique distribution methodology and unique pricing. The industry views eBooks as a separate economic segment of the more general book market.

30.     A hypothetical monopolist that controlled the supply of eBooks would have the ability to raise the price of eBooks substantially for a significant period of time without consumers substituting another product.

31.     Publisher Defendants and Apple have exerted market power over eBook sales, as demonstrated by the anticompetitive effects of their conduct. Here, Defendants exercised market power as evidenced by their ability to raise prices above the competitive level—*i.e.*, by increasing prices by at least 30 percent above similar books published under the previous wholesale model utilized by Amazon.

**The Industry**

32.     eBooks are usually read on dedicated hardware devices known as eReaders. Personal computers, tablets, and some cell phones can also be used to read eBooks. eBooks are sold directly through eReaders, as well as through the web.

33.     Sony launched the first commercially successful eReader, the Sony Reader, in 2006.

34.     The following year, Amazon released the Kindle. Amazon's Kindle quickly became the market leader by offering a much broader selection of books than Sony and offering them at a discount price of $9.99. Amazon instituted its discounted pricing model even though in many instances the wholesale price it paid equaled or even exceeded $9.99. Amazon was willing to offer this discount pricing in part to grow market share. Amazon also knew that with sufficient buying power and efficiencies it could eventually reduce the surplus publishers were paid for eBooks and increase its own profit margins.

35.     eBooks combined with Amazon's discount pricing forced traditional booksellers to respond by introducing competing technology and pricing. In 2009, Barnes & Noble released its own eReader—the Nook—and tried to match Amazon's pricing. Following Barnes & Noble's announcement, Sony similarly announced that it would adopt the $9.99 pricing for its Sony Reader.

36.     Although Amazon's $9.99 pricing policy was near or even sometimes below the price Amazon paid to book publishers for certain mass market eBook content, its aggressive eBook pricing practices succeeded in fueling Kindle sales and increasing Amazon's share of the eReader market. According to Credit Suisse, as of February 2010, Amazon's Kindle eBooks occupied 90 percent of the market for eBooks.

37.     Consumers rapidly adopted new book reading habits, making eBooks hugely popular. Indeed, the Association of American Publishers reports that eBooks are the fastest-growing segment of the book publishing industry. In July 2010, Amazon reported that sales of eBooks for its Kindle in the second quarter of 2010 outnumbered sales of hardcover books for the first time.

38.     Hardcover books, specifically the sale of front list titles, form the core sales for the Publisher Defendants (who in turn sell about 75 to 85 percent of the fiction market). Publishers have the highest margin per unit of sale from printed hardcovers which are sold to the trade (wholesalers, booksellers, etc.) at discounts of 30 to 60 percent off the list price depending on the account.

39.     While eBook sales provided additional incremental unit sales over physical books, in an unrestrained market the margin per unit of sale for eBooks is lower than physical books.

40.     Thus, publishers had the economic incentive to do two things: (a) slow down the rate of eBook adoption, and (b) protect (and even increase) the margins for eBook sales. However, if one publisher acted independently to raise its prices, it would risk losing market share to its competitors.

41.     By slowing down the rate of adoption and increasing prices, new entrants into the digital market will be less inclined to demand a $9.99 price point made popular by Amazon.

42.     Further, the Publisher Defendants knew that, for any consumers who responded to price increases for eBooks under the new Agency Model by purchasing paper books, it would only further benefit the publishers because the print margin is frequently larger than eBook margins under the Agency Model.

**Unlawful Agreement to Restrain Trade or Commerce**

43.     The $9.99 standard eBook price set by Amazon threatened the economic models of many large publishers, including Publisher Defendants.  With decreasing retail prices for eBooks, publishers feared the rapidly increasing movement by consumers away from physical book purchases.  They also anticipated that, as the popularity of eBooks grew, Amazon and other retailers would pressure publishers to reduce their wholesale prices for eBooks, thereby reducing their profit-per-unit.

44.     Publishers were used to having the ability to establish predictable retail prices based on longstanding pricing behavior in the paper book industry.  Under the traditional print model, the publishers and their supply chain partners would agree on a standard discount schedule in which the retailer would purchase the book for a percentage below the suggested retail price, and the publishers would control the speed of pricing decay by phasing in discounted pricing through later release of paperback books.

45.     In response to Amazon's eBook business model, Publisher Defendants took steps to mitigate what they perceived to be the potential future reduced profits associated with eBook sales. For example, several major publishers, including defendant HarperCollins, held back the release of eBook versions of some hardcover bestsellers by timing the release a month or more after the hardcover release. For its part, Macmillan lowered its royalty rate for eBooks by 5 percent.

46.     In addition to these techniques, Publisher Defendants tried to pressure Amazon to raise retail prices on eBooks; Amazon flatly refused. Absent collusion, Publisher Defendants were unable to force Amazon to raise its eBooks retail prices. Given Amazon's dominant market share for eBook sales, each publisher knew that if it tried to unilaterally and independently insist on raising retail prices it would immediately lose eBook sales and market share to its competitors.

47.     Amazon's success was also causing concern for Apple. Specifically, Apple had strong incentives to help the Publisher Defendants force Amazon to abandon its discount pricing. Apple knew that devices like the Kindle are characterized by strong network effects; that is, the value of a Kindle to an individual purchaser rises as the total number of purchasers increase. This occurs because growth in the installed base attracts additional and superior content and drives down prices. Because of these network effects, Apple knew that if Amazon was allowed to continue to solidify its dominant position in the eBook market, these network effects would make it nearly impossible to dislodge Amazon in the eBook market. Apple knew the power of this strategy because it had used a virtually identical strategy to dominate the sale and distribution of digital music files.

48.     Apple's interest in entering the eBooks market was not simply to profit from the sale of eBooks.  Apple believed it necessary to enter the eBooks market because it viewed Amazon and its Kindle platform as a long-term threat to its dominant position in the sale and marketing of mobile devices designed to distribute, store and access digital media, and Apple's iOS content distribution platform.  These devices include the Apple iPhone, iPod, and iPad.

49.     Amazon's pro-consumer pricing meant that in order to enter the eBooks market, Apple would likely be forced to sell at least some eBooks near or below the input cost for an extended period of time.  To gain market share, Apple might even be forced to offer eBooks at even lower prices than Amazon offered.  Apple and the Publisher Defendants thus shared a common anticompetitive interest in forcing Amazon (and the rest of the market) to raise the prices for eBooks.

50.     Aware of Apple's interest in protecting and expanding its dominant position in the sale and marketing of mobile devices designed to distribute, store and access digital media, Amazon had already taken steps to compete with Apple.  After numerous commentators observed that Apple's popular App Store offered 70 percent of royalties to software application publishers, Amazon began a program that offered 70 percent royalties to Kindle publishers who agreed to certain conditions.  In order to be eligible, authors were required to list their books for between $2.99 and $9.99 on the Kindle, and the price had to be at least 20 percent below the lowest list price for the print edition.

51.     In January 2010, Apple and the Publisher Defendants agreed to a plan that would allow Apple to erode Amazon's market position and benefit Apple and the Publisher Defendants by raising prices on first release eBooks.

52.     On January 23, 2010 it was reported that Apple had negotiated agreements with Hachette, HarperCollins, Macmillan, Penguin and Simon & Schuster to switch from a wholesaler-retailer model to an "Agency Model" for eBook sales.

53.     Four days later, on January 27, 2010, Apple announced a multi-function tablet device called the iPad. One of the functions of the iPad was the ability to read eBooks. This put Apple into direct competition with Amazon, who at the time of the iPad's release, had an overwhelming share of the markets for eBooks and eReaders.

54.     When Apple announced the iPad's debut in January 2010, its CEO Steve Jobs indicated that Apple had agreements in place with five of the six largest publishing houses – Hachette Book Group, HarperCollins, Macmillan, Penguin, and Simon & Schuster – to provide eBook content for the new device. Those agreements were based on a so called "Agency Model," which gives publishers the ability to set eBook prices and makes Apple a distribution agent for sales to consumers. Apple receives a 30 percent commission from each eBook sale through Apple's online bookstore, with the remaining seventy percent going to publishers.

55.     The publishers' authority to price under their agreements with Apple, however, is restrained as the contracts contain a formula that ties eBook prices to the list prices of comparable print editions. This common formula agreed to by the Publisher Defendants and Apple operates to increase, standardize, and stabilize most first-release general fiction and nonfiction titles. The effect of this term will increase and stabilize eBook prices to a range of $12.99 to $14.99 for most general fiction and nonfiction titles. Apple and the Publisher Defendants also agreed that the Publisher Defendants would not set prices of eBooks offered through other distribution channels (e.g., Amazon's Kindle store) below the prices the Publisher Defendants sold through the iBookstore (the "MFN Clause").

56.     The effect of the MFN Clause, combined with the pricing formula tied to physical book prices, was to increase prices to Plaintiff and the Class members and reduce competition for the eBooks of the Publisher Defendants, specifically for the price of most newly released adult fiction and nonfiction eBooks; this resulted in increasing and stabilizing eBook prices and eliminated competitive pricing (including the discount $9.99 pricing by Amazon).  Apple coordinated these agreements with the Publisher Defendants.  On information and belief, in the course of entering into agreements with Apple, Apple and the Publisher Defendants communicated the terms of the agreements and pricing information with each other, including signaling to each other that they would agree to the MFN Clause and price formula that would increase and standardize pricing to a range between $12.99 to $14.99.

57.     It was well understood and intended by the Publisher Defendants and Apple that their agreements would raise prices for consumers of eBooks.  For example, on February 2, 2010, Rupert Murdoch, News Corp. CEO, indicated he was unhappy with Amazon's prices and that the agreement with Apple would help to achieve "higher prices."

58.     Once the Publisher Defendants and Apple agreed to the radical switch to the Agency Model, the Publisher Defendants approached Amazon to require it to switch to a similar structure.

59.     Macmillan reportedly proposed that Amazon agree to sell Kindle editions of Macmillan's books as an agent, on the same 70/30 terms contained in the Publisher Defendants' agreement with Apple.  Alternatively, Macmillan offered to permit Amazon to keep purchasing eBooks under the existing wholesale model, but warned that it would begin delaying release of those eBook editions (reducing output) until seven months after publication of the hardcover

edition. Notably, the latter offer would have crippled Amazon's competitive position against Apple.

60.     MacMillan was able to threaten Amazon with this ultimatum even though Amazon at the time possessed 90 percent of the market share for eBook sales, because, on information and belief, Macmillan knew each of the other Publisher Defendants had reached similar agreements with Apple. Like Macmillan, the other Publisher Defendants and Apple had agreed to pricing formulae and MFN clauses, assuring themselves that Amazon would be closed out of the market for the Publisher Defendants' eBook titles unless Amazon agreed to allow the Publisher Defendants to raise prices.

61.     Amazon made an initial effort to fight these demands by pulling all Macmillan titles off both the Kindle site and Amazon.com. However, within days, the books were back for sale and Amazon had bowed to Macmillan's demands. In a strongly worded message on its website, Amazon stated, "We have expressed our strong disagreement and the seriousness of our disagreement by temporarily ceasing the sale of all Macmillan titles. We want you to know that ultimately, however, we will have to capitulate and accept Macmillan's terms because Macmillan has a monopoly over their own titles, and we will want to offer them to you even at prices we believe are needlessly high for e-books." Very soon therafter, Amazon entered into agency agreements with each of the four other major publishers that had signed on with Apple.

62.     Hachette and Penguin also forced Amazon to switch to the Agency Model. On information and belief, HarperCollins and Simon & Schuster similarly pressured Amazon to adopt the Agency Model during the same time period.

63.     As a result of the coordinated and unlawful conduct of the Defendants, Sony and Barnes & Noble have also been forced to adopt the Agency Model for eBook pricing.

64. Consumers were clearly angered by the switch to the Agency Model and the anticipated rise in eBook prices that it would cause. In March 2010, after the switch was announced but before it was effectuated, eBook sales increased 184 percent. Some Kindle users posting in various online communities attributed the sudden spike in eBook sales to a last ditch effort by readers to stock up on eBooks before the switch to the Agency Model.

65. Random House was the only big six publisher who did not join with Apple to adopt the Agency Model. Random House continued to use the wholesale model. In 2010, Random House saw a 250 percent increase in eBook sales in the United States in 2010 and an 800 percent increase in the United Kingdom.

66. As a result of Random House being willing to allow price competition, Apple – per its agreements with the Publisher Defendants – refused to allow Random House to sell its books through Apple's iBookstore. Absent the anticompetitive restraints agreed to by Apple and the Publisher Defendants, Apple would not have an economic incentive to force Random House to utilize the Agency Model. Instead, Apple would seek the widest possible selection of eBooks whether or not sold directly or through the Agency Model. In banning Random House books from its iBook store, Apple acted pursuant to the conspiracy described above and with the purpose and intent of forcing Random House to join the conspiracy it had helped to create and raise prices. Random House ultimately switched to the Agency Model effective March 1, 2011.

67. The Publisher Defendants and Apple could not have switched to the Agency Model without a coordinated effort because eBooks are substitutes for each other. For example, if a consumer saw that a title listed through Apple's iBookstore was $14.99, and was also available at $9.99 if purchased through Amazon's Kindle App, the consumer could simply just load the least expensive version of the eBook title onto his eReader device. Thus, no single

major publisher would risk such loss of sales and insist on the Agency Model by itself. Moreover, the shift to the Agency Model occurred simultaneously and almost overnight – under any definition this shift constitutes a radical, structural change to a business model that has been in existence for decades.

68.     The anticompetitive nature of this conspiracy, and the Publisher Defendants' motivation to control eBook pricing, is also revealed by the fact that certain eBooks are now priced the same as – or even higher than – the price for the same titled physical book.  Yet, the printing and distribution costs of hardcover books are greater.  Thus, absent anticompetitive motivation and joint conduct, the difference in prices between hardcover books and eBooks would be greater.  However, this is often not the case as publishers are motivated to raise eBook prices to levels close to hardcover books.  The Amazon model was a direct threat to accelerating the decay of hardcover book sales (and margins).

69.     Jobs and Apple would not have agreed to go to the Agency Model unless they knew the Publisher Defendants would not sell their eBooks through other distribution channels at lower prices.  Absent such an agreement, Apple could not have competed at the higher prices for eBooks if it did not coordinate with the Publisher Defendants to ensure Apple was not the only eReader platform agreeing to the Agency Model and higher, standardized prices.

70.     Apple's strategy for gaining market share at the expense of Amazon was successful.  According to a 2010 survey conducted by ChangeWave, between August and December 2010, the iPad's share of the U.S. eReader market rose 16 percentage points and the Kindle's fell 15 percentage points.

71.     The trend of Apple's increasing market share and Amazon's declining share is predicted to continue.  Of the respondents in the ChangeWave survey planning on buying an

eReader in the next 90 days, 42 percent said they would like an iPad, while only 33 percent said they would opt for a Kindle.

72.     In addition, a Credit Suisse analyst announced in February 2010 that, as a result of the switch to the Agency Model, he expected Amazon's share of the eBooks market to fall from 90 percent to 35 percent over the next five years.

73.     As a result of the unlawful anticompetitive actions alleged above, the price of eBooks has soared. eBooks now often cost more than their print counterparts. For example, at Amazon.com the price of *The Kite Runner* (Penguin) costs $12.99 in Kindle version and $8.82 as a paperback. Other examples of this price discrepancy among current and former bestselling titles on Amazon.com include: *Don't Blink* (Hachette, $14.99 digital and $14.74 hardcover); *Best Friends Forever* (Simon & Schuster, $11.99 digital and $10.79 paperback); *Heart of the Matter* (St. Martin's Press/Macmillan, $9.99 digital and $8.03 paperback); and *The Art of Racing in the Rain* (HarperCollins, $9.99 digital and $7.99 paperback).

74.     In addition, because the price of eBooks is no longer set by the retailer, promotional discounts and customer reward programs have effectively ended as to eBook sales.

75.     By coordinating and entering into the above agreements, Apple and the Publisher Defendants have raised, stabilized, and standardized eBook prices. Absent this anticompetitive conduct, eBook prices would be lower and there would be price competition.

76.     The Publisher Defendants have not required an Agency Model for internet sales of physical books. The effect of the conspiracy has been to increase and standardize pricing for eBooks, compared to the diverse competitive pricing for internet sales of the physical book for the same title under the wholesale model.

**Antitrust Injury**

77.     But for Defendants' conspiracy to raise the prices of eBooks through the switch to the Agency Model of eBook pricing, the prices of eBooks would be substantially lower than their current price.  Moreover, consumers would have enjoyed additional features such as promotional discounts and rewards programs traditionally offered by retailers.

78.     As a direct result of Defendants' anticompetitive actions, competition in the market for eBooks has been restrained and Plaintiff and the Class members have paid supr-competitive prices for eBooks.

## CLASS ACTION ALLEGATIONS

**Nationwide Direct Purchaser Class**

79.     Prior to the adoption of the Agency Model, Apple, Amazon, Barnes & Noble and Sony acted as resellers of eBooks through their eReaders, and they set retail prices in response to unrestrained market forces.

80.     Under the Agency Model, publishers set the retail prices of eBooks purchased by consumers and the publishers pay Amazon, Apple, Barnes & Noble and Sony a fixed commission of 30 percent of the retail price.

81.     Under the Agency Model, the "agents" – *e.g.*, Amazon, Barnes & Noble, Sony, or Apple – do not set or modify retail pricing.  Rather, the Publisher Defendants directly set the retail sales price offered to consumers.

82.     Under the Agency Model, consumers purchase directly from the Publisher Defendants a license for limited use (*i.e.*, reading) of the eBook content.  The Publisher Defendants do not sell the "eBook" to Amazon or Apple, and these platforms (Apple and Amazon) do not hold title to the eBook or its content.  Moreover, a physical product is not

transferred from publisher to retailer or from retailer to consumer. Rather, pursuant to an eBook "sale" under the Agency Model, the Publisher Defendants are selling access to the publishers' copyrighted works directly to consumers, and the consumer directly purchases such an eBook from a Publisher Defendant.

83.    Apple's user agreement for its iBookstore expressly acknowledges that consumers directly purchase from publishers under the Agency Model.

84.    Amazon likewise makes clear in its terms and conditions that the publishers are the entities who are selling use of the eBook content directly to consumers.

85.    Because "the price" that Plaintiff and consumers "have paid directly is the one that was unlawfully fixed," *In re ATM Fee Antitrust Litig.*, No. C 04-02676, 2010 U.S. Dist. LEXIS 97009, at *24 (N.D. Cal. Sept. 16, 2010), Plaintiff and eBook consumers are direct purchasers of eBooks from the Publisher Defendants.

86.    Because the simultaneous adoption of the Agency Model represents a "conspiracy among horizontal competitors at the retail level to fix retail prices," the Supreme Court's decision in *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977) "does not prevent this garden variety price-fixing claim." *State of Ariz. v. Shamrock Foods Co.*, 729 F.2d 1208, 1211 (9th Cir. 1984).

87.    Plaintiff sues on behalf of a class of persons pursuant to Federal Rule of Civil Procedure 23 (the "Class"). The Class consists of:

> all persons in the United States who purchased eBooks published by one of the Publisher Defendants directly from a Publisher Defendant after the adoption of the Agency Model by that publisher. Excluded from the Class are Defendants, their employees, co-conspirators, officers, directors, legal representatives, heirs, successors and wholly or partly owned subsidiaries of affiliated companies.

88.     The persons in the Class are so numerous that individual joinder of all members is impracticable under the circumstances of this case. Although the precise number of such persons is unknown, the exact size of the Class is easily ascertainable, as each Class member can be identified by using Defendants' records and/or the records of their distributors or retailers. Plaintiff is informed and believes that there are many thousands of Class members.

89.     There are common questions of law and fact specific to the Class that predominate over any questions affecting individual members, including:

(a)     Whether Defendants unlawfully contracted, combined and conspired to unreasonably restrain trade in violation of Section 1 of the Sherman Act by agreeing to switch to the Agency Model of eBook pricing and by agreeing to restrict the price range of eBooks;

(b)     Whether Defendants' actions in entering the agency agreements alleged herein violated the federal antitrust laws;

(c)     Whether Defendants were unjustly enriched by entering into the agency agreements alleged above;

(d)     Whether consumers and Class members have been damaged by Defendants' conduct;

(e)     Whether Defendants should disgorge their unlawful profits;

(f)     The amount of any damages; and

(g)     The nature and scope of injunctive relief necessary to restore a competitive market.

90.     Plaintiff's claims are typical of the Class' claims, as they arise out of the same course of conduct and the same legal theories as the rest of the Class, and Plaintiff challenges the practices and course of conduct engaged in by Defendants with respect to the Class as a whole.

91.     Plaintiff will fairly and adequately protect the interests of the Class.  Plaintiff has retained Class Counsel who are able and experienced class action litigators.

92.     Resolution of this action on a class-wide basis is superior to other available methods and is a fair and efficient adjudication of the controversy because in the context of this litigation, no individual class member can justify the commitment of the large financial resources to vigorously prosecute a lawsuit against Defendants.  Separate actions by individual class members would also create a risk of inconsistent or varying judgments, which could establish incompatible standards of conduct for Defendants and substantially impede or impair the ability of Class Members to pursue their claims.  A class action also makes sense because Defendants have acted and refused to take steps that are, upon information and belief, generally applicable to thousands of individuals, thereby making injunctive relief appropriate with respect to the Class as a whole.

**Alternative Nationwide Direct Purchaser Class**

93.     In the event Plaintiff is not deemed a direct purchaser from a Publisher Defendant, Plaintiff makes the following alternative class allegations:

94.     Apple, as a co-conspirator with the Purchaser Defendants, sells eBooks to consumers through its iBookstore application.

95.     Consumers who have purchased eBooks from Apple have paid and continue to pay prices that were unlawfully fixed.  Thus, Plaintiff and consumers who purchased eBooks from Apple are direct purchasers of eBooks.

96.     Plaintiff sues on behalf of a class of persons pursuant to Federal Rule of Civil Procedure 23 (the "Alternative Class").  The Alternative Class consists of:

> all persons in the United States who purchased eBooks directly
> from Apple through its applications, including its iTunes and
> iBookstore applications, after Apple and Publisher Defendants

entered into the agreements giving the Publisher Defendants the authority to set prices of eBooks. Excluded from the Class are Defendants, their employees, co-conspirators, officers, directors, legal representatives, heirs, successors and wholly or partly owned subsidiaries of affiliated companies.

97.      The persons in the Alternative Class are so numerous that individual joinder of all members is impracticable under the circumstances of this case. Although the precise number of such persons is unknown, the exact size of the Alternative Class is easily ascertainable, as each Alternative Class member can be identified by using Apple's records and/or the records of its distributors or retailers. Plaintiff is informed and believes that there are many thousands of Alternative Class members.

98.      There are common questions of law and fact specific to the Alternative Class that predominate over any questions affecting individual members, including:

(a)      Whether Defendants unlawfully contracted, combined and conspired to unreasonably restrain trade in violation of section 1 of the Sherman Act by agreeing to switch to the Agency Model of eBook pricing and by agreeing to restrict the price range of eBooks;

(b)      Whether Defendants' actions in entering the agency agreements alleged above violated the federal antitrust laws;

(c)      Whether consumers and Alternative Class members have been damaged by Defendants' conduct;

(d)      Whether Defendants should disgorge unlawful profits;

(e)      The amount of any damages; and

(f)      The nature and scope of injunctive relief necessary to restore a competitive market.

99.     Plaintiff's claims are typical of the Alternative Class' claims, as they arise out of the same course of conduct and the same legal theories as the rest of the Alternative Class, and Plaintiff challenges the practices and course of conduct engaged in by Apple with respect to the Alternative Class as a whole.

100.    Plaintiff will fairly and adequately protect the interests of the Alternative Class. Plaintiff has retained Class Counsel who are able and experienced class action litigators.

101.    Resolution of this action on a class-wide basis is superior to other available methods and is a fair and efficient adjudication of the controversy because in the context of this litigation, no individual class member can justify the commitment of the large financial resources to vigorously prosecute a lawsuit against Defendants.  Separate actions by individual class members would also create a risk of inconsistent or varying judgments, which could establish incompatible standards of conduct for Defendants and substantially impede or impair the ability of Class Members to pursue their claims.  A class action also makes sense because Defendants have acted and refused to take steps that are, upon information and belief, generally applicable to thousands of individuals, thereby making injunctive relief appropriate with respect to the Class as a whole.

## FIRST CLAIM
## VIOLATION OF THE SHERMAN ACT
### (15 U.S.C. § 1)
### (On Behalf of the Class and the Alternative Class)

102.    Plaintiff incorporates by reference the allegations in the preceding paragraphs.

103.    Plaintiff does not believe it is necessary to prove a relevant market.  To the extent one is required, the relevant product market is eBooks.

104.    To the extent required, the relevant geographic market is the entire United States.

105.    Defendants by and through their officers, directors, employees, agents and other representatives have entered into an unlawful agreement, combination and conspiracy in restraint of trade. Specifically, Defendants have unlawfully agreed to artificially inflate the retail price range of eBooks by switching to an Agency Model in which eBook prices are determined using a common formula across individual books and publishers. This unlawful agreement has unreasonably restrained price competition among retailers for eBook sales.

106.    Plaintiff and the Class members have been injured and will continue to be injured in their businesses and property by paying more for eBooks than they would have paid or would pay in the future in the absence of Defendants' unlawful acts.

107.    Plaintiff and Class members are direct purchasers of eBooks from Purchaser Defendants because the Publisher Defendants set the retail price for eBooks, and Amazon, Apple and other eBook distributors are acting only as agents with respect to each such purchase by Plaintiff and members of the Class.

108.    Plaintiff and the Class are entitled to an injunction that terminates the ongoing violations alleged in this Complaint.

### SECOND CLAIM
### UNJUST ENRICHMENT
**(On Behalf of the Class and the Alternative Class)**

109.    Plaintiff incorporates by reference the allegations in the preceding paragraphs.

110.    To the detriment of Plaintiff and members of the Class, Defendants have been and continue to be unjustly enriched as a result of the unlawful and/or wrongful conduct alleged herein. Defendants have unjustly benefited through the sale of eBooks at an inflated, supra-competitive price to Plaintiff and members of the Class.

111.    Between the parties, it would be unjust for Defendants to retain the benefits attained by their unfair, unjust, and unlawful actions.  Accordingly, Plaintiff and members of the Class seek full restitution of Defendants' unjust enrichment, benefits and ill-gotten gains acquired as a result of the unlawful and/or wrongful conduct alleged herein.

## JURY TRIAL DEMANDED

112.    Plaintiff hereby demands a trial by jury of all the claims asserted in this Complaint.

## RELIEF REQUESTED

Accordingly, Plaintiff, on behalf of himself and the Class members, seeks judgment as follows:

(a)    Certification of the action as a Class Action pursuant to the Federal Rule of Civil Procedure 23, and appointment of Plaintiff as Class Representative and his counsel of record as Class Counsel;

(b)    A declaration that Defendants' conduct constitutes a conspiracy and that Defendants are liable for the conduct or damage inflicted by any other co-conspirator;

(c)    A declaration that Defendants' conduct is in violation of the federal antitrust laws;

(d)    A declaration that the pricing formula contained in the agency agreements described above is unlawful;

(e)    A declaration that Defendants were unjustly enriched by their unlawful conduct;

(f)    Restitution and/or damages to Plaintiff and the Class members for the purchase of eBooks;

(g)    Actual damages, statutory damages, punitive or treble damages, and such other relief as provided by the federal antitrust laws;

(h)    Equitable relief in the form of restitution and/or disgorgement of all unlawful or illegal profits received by Defendants as a result of the anticompetitive conduct alleged in herein;

(i)    Injunctive relief enjoining Defendants from pricing eBooks using the pricing formula contained in the agency agreements;

(j)    Pre-judgment and post-judgment interest on monetary relief awarded;

(k)    The costs of bringing this suit, including reasonable attorneys' fees; and

(l)    All other relief to which Plaintiff and members of the Class may be entitled at law or in equity.

Respectfully submitted,

Bernard Persky (BP-1072)
Hollis L. Salzman
Gregory S. Asciolla
Kellie Lerner
LABATON SUCHAROW LLP
140 Broadway, 34th Floor
New York, NY 10005
Telephone:  (212) 907-0700
bpersky@labaton.com
hsalzman@labaton.com
gasciolla@labaton.com
klerner@labaton.com